MOORE, Chief Justice
(concurring specially).

I. Introduction

This case exemplifies some of the confusion the tort of bad faith has created over the last 30 years for Alabama trial courts, for appellate courts, and for attorneys in general.
In Lavoie v. Aetna Life & Casualty Co., 374 So.2d 310, 312 (Ala.1979) (“Lavoie /”), this Court stated that it would “not foreclose the possibility of recovery in tort for the bad faith refusal of an insurer to pay legitimate benefits,” citing Vincent v. Blue Cross-Blue Shield of Alabama, Inc., 373 So.2d 1054 (1979), and Childs v. Mississippi Valley Title Insurance Co., 359 So.2d 1146 (1978).
However, it was not until 1981 that this Court, according to Justice Reneau Almon in his dissent in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1, 15 (Ala.1981), with “zeal, ardor, and with iron determination, introduce[d][us] to Mr. Bad Faith” and recognized the intentional tort of bad faith for the breach of a contract by an insurance company. In Chavers this Court adopted the test proposed in the dissent in Vincent and held that
“an actionable tort arises for an insurer’s intentional refusal to settle a direct claim where there is either ‘(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.’ ”
405 So.2d at 7. The tort of bad faith is based upon the fact that “ ‘[ejvery contract contains an implied in law covenant of good faith and fair dealing’ ” and the “ ‘[bjreach of [that] covenant provides the injured party with a tort action for “bad faith” notwithstanding that the acts complained of may also constitute a breach of contract.’” Id. at 4 (quoting Childs, 359 So.2d at 1152).
The next year in National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982), Justice Richard (“Red”) Jones distinguished “ordinary” bad-faith cases from “extreme” cases, which in time led to the phraseology of the “normal” bad-faith case versus the “abnormal” bad-faith case. 419 So.2d at 1363-1364 (Jones, J., concurring specially). Justice Champ Lyons in Employees’ Benefit Ass’n v. Gris sett, 732 So.2d 968, 976 (1998), defined the “abnormal” bad-faith case as follows:
“The rule in ‘abnormal’ cases dispensed with the predicate of a prever-dict [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally *261 failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation. A defendant’s knowledge or reckless disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured.
“So, a plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a ‘normal’ case, or, failing that, can prove that the insurer’s failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive.”
732 So.2d at 976 (citations omitted).
In 1999, Justice Lyons explained these terms for the Court again: “[t]he ‘unusual or extraordinary’ case was then referred to as the ‘abnormal’ bad-faith case, and the ‘directed-verdict-on-the-contract-claim’ case was called the ‘normal’ bad-faith case.” State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 306 (Ala.1999).
Chief Justice Bo Torbert noted in Chav-ers that “[i]t will be interesting to follow the impact of the majority’s views on the contractual relationship between the insurers and their insureds.” Chavers, 405 So.2d at 14 (Torbert, C.J., dissenting).
And throughout the years, Justices, including Chief Justice Torbert, Justice Hugh Maddox, and Justice Jones, did indeed watch with great interest that impact.
In 1984 Chief Justice Torbert, dissenting in Aetna Life Insurance Co. v. Lavoie, 470 So.2d 1060, 1079 (Ala.1984) (“Lavoie II ”), explained:
“Tort duties are difficult to judicially define or confine; ... the process becomes endless, with attempts to cover each fact situation specifically as it arises, ultimately causing more confusion than clarity, as the specific rules inevitably conflict.”
In Lavoie II, Justice Maddox, also dissenting, stated that “the Court has expressed differing views on the standards to be used ... in determining when and under what circumstances the tort was established.” 470 So.2d at 1088 (Maddox, J., dissenting).
Three years later, Justice Maddox noted in a special concurrence in Aetna Life Insurance Co. v. Lavoie, 505 So.2d 1050, 1058 (Ala.1987) (“Lavoie III”), that the Court has had “difficulty with this kind of claim from the beginning.”
Justice Jones also expressed concern, shortly after the Court first recognized the tort of bad faith, that the two tiers of bad faith were confusing. He stated:
“I think it is more confusing than helpful to discuss the requisite elements of punitive damages in a bad faith context in terms of either ‘malice’ on the one hand or “wanton and reckless’ on the other.... Language that implies a two-tier test is misleading and improper.”
Continental Assurance Co. v. Kountz, 461 So.2d 802, 810 (Ala.1984) (Jones, J., concurring specially).
Justice Maddox, dissenting in that case, opined that the test for “normal” bad faith is much like a court having to say that although “obscenity” cannot be defined, “I know it when I see it.” Id. at 811. (Maddox, J., dissenting). He charged the Court with “failing] to give ... settled principles to guide ... in determining when, and under what circumstances, the tort can be established.” Id.
Alabama’s present version of the tort of bad faith remains at least as confusing and amorphous as when the Court recognized the tort in 1981. Such difficulties will *262 always be present whenever the judiciary violates the separation-of-powers doctrine.
II. The Impact of Chavers
“The whole question of bad faith by insurance companies might be an issue more properly addressed by the legislature.” Lavoie II, 470 So.2d at 1080 (Tor-bert, C.J., dissenting). “ ‘[I]n our scheme of government, policy questions like this, [that] involve the heavily regulated insurance industry, should properly be addressed by the Legislature, but the Legislature has not acted.’” Lavoie III, 505 So.2d at 1058 (Maddox, J., concurring specially) (quoting his dissent in Kountz, 461 So.2d at 812). In Lavoie III, Justice Maddox stated:
“[I]t is apparent that there are serious public policy considerations involved which are difficult for me, and I believe for this Court, to address.
“The same public policy considerations which plagued me in Chavers, when the tort was recognized, continue to plague me.
[[Image here]]
“ ‘... [I]n our scheme of government, policy questions like this, especially since they involve the heavily regulated insurance industry, should properly be addressed by the Legislature, but the Legislature has not acted.’ ”
Id. at 1057-58. See also Kountz, 461 So.2d at 811-13(Maddox, J., dissenting) (same); and Thomas v. Principal Fin. Group, 566 So.2d 735, 751 (1990) (Maddox, J., concurring in part and dissenting in part) (same); Independent Fire Ins. Co. v. Lunsford, 621 So.2d 977, 982 (Ala.1993) (Maddox, J., concurring in part and dissenting in part) (same); and Ex parte Simmons, 791 So.2d 371, 382 (Ala.2000) (Maddox, J., concurring in the result) (same).
On October 2, 1981, this Court released both Chavers and Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (1981). In Chavers, the Court recognized that it was making a “new” law, stating:

“[T]he law applicable to first party actions involving a direct claim by the insured is not so well settled....

[[Image here]]
“... Heretofore, we have reserved any ruling on this tort, ‘necessarily awaiting the factual context of a live litigated case for a more definitive statement of its elements and application.’ ”
Chavers, 405 So.2d at 5-6 (citation omitted) (emphasis added). Chavers recognized “the intentional tort of bad faith in first party insurance actions.” Id. at 6. On the very same day, the Barnes opinion sought to “restate” the requirements,
“under Alabama law, for establishment of the tort of bad faith refusal to pay a valid claim. The latest pronouncement by this Court on this question was made in Chavers v. National Security Fire and Casualty Company.”
405 So.2d at 923. Chavers also cross-referenced Barnes: “[W]e have now by our opinion in this case, as well as in [Barnes,] delineated the tort of bad faith requisites with sufficient clarity to be helpful.” 405 So.2d at 11.
Taking Chavers and Barnes together, this Court believed its recognition of the tort of bad faith was a pronouncement of Alabama law. The pronouncement of what a new tort law shall be for future application is a legislative act. “It has been well said, that, ‘to declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislation.’ ” Alabama Life Ins. & Trust Co. v. Boykin, 38 Ala. 510, 513 (1863). The Constitution bars the judiciary from exercising legislative powers, which are wholly vested in the legislative branch. This Court’s attempt *263 in Barnes and Chavers to recognize a new tort was an unconstitutional usurpation of legislative powers.
Chavers based its judicial legislation on what members of this Court believed public policy required. See Chavers, 405 So.2d at 6 (“[T]he inherent policy considerations mandat[e] our recognition of a re-dressable tort for intentional breach of good faith”). However, “[t]he Legislature is endowed with the exclusive domain to formulate public policy in Alabama, a domain upon which the judiciary shall not trod.” Cavalier Mfg., Inc. v. Jackson, 828 So.2d 1287, 1248 (Ala.2001). “[T]he authority to declare public policy ... is reserved to the Legislature.” Ex parte State Farm Fire & Cas. Co., 764 So.2d 543, 547 (Ala.2000). Although the legislature may determine a need for action based upon public policy, the judiciary must be blind to the competing public-policy interests and conditions of insurer and insured, for “[jjustice is blind, says the law, and in her judgment must see no man, color, race, or condition.” Jones v. State, 21 Ala.App. 234, 236,109 So. 189,191 (1926).
Those times when the legislature has not acted give the Court no mandate for judicial usurpation of legislative powers, even in areas of great public concern, such as an insurer’s refusal to pay a legitimate claim. Thus, contrary to Justice Maddox’s recommendation, the Court cannot and should not “fashion an appropriate remedy for every wrong, and should [not] do so if thé legislative branch does not address the wrong.” Lavoie III, 505 So.2d at 1060 (Maddox, J., concurring specially). “[T]he legislature is uniquely qualified to make those determinations.” Id.
“The job of making law belongs exclusively to the Legislature. The desire or need for action in a particular area of public policy cannot justify a court’s intruding itself into the field of legislation in order to reach a desired result....”
Ex parte James, 836 So.2d 813, 876 (2002) (Moore, C.J., concurring in the result in part and dissenting in part). In the area of tort law, “[t]o enact a judge’s public policy vision ... represents an attempt to have the judiciary act in a legislative capacity.” 836 So.2d at 859. Legislative inaction simply does not grant the judiciary new powers either to engage in public-policy analysis or to create law. Perhaps an intentional breach of a contract for insurance should be punishable by an award of punitive damages, but that is a question that should be addressed by the legislature of this State, not the courts.

III. The Nature of Judicial Opinions

The members of the judiciary are often tempted to think judicial opinions create law, as if, by fiat, “ ‘out of the facts the law arises’ ... created in the Supreme Court’s laboratory with only an empty test tube.” Chavers, 405 So.2d at 14 (Almon, J., dissenting). When the judiciary indulges this temptation, our government of laws is dismantled, replaced with a government of men, in violation of Art. Ill, § 43, of our Constitution. Blackstone explained, “the law, and the opinion of the judge are not always controvertible terms, or one and the same thing; since it sometimes may happen that the judge may mistake the law.” 1 William Blackstone Commentaries *71. “[W]e may take it as a general rule, ‘that the “decisions of courts of justice are the evidence of what is common law.”’” Id. (emphasis added). Again, “these judicial decisions are the principal and most authoritative evidence, that can be given, of the existence of such a custom as shall form a part of the common law.” Id. at *69 (emphasis added).
Chancellor James Kent agreed: “The reports of adjudged cases are admitted to *264 contain the highest and most authentic evidence of the principles and rules of the common law.” 1 James Kent Commentaries on American Law *465 (1826). As judges, we are “sworn to determine, not according to [our] own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.” Commentaries *71 (emphasis added).
Thus, our judicial opinions are not law, but rather evidence of the law. We issue opinions; we do not enact statutes. Judicial opinions are signposts. As signposts, judicial opinions may point later travelers the right direction to already existing law, or may point the wrong direction to previously nonexistent, judicially created “law.” The judiciary should maintain correct signs but remove or replace signs that lead travelers astray. Chavers and Barnes did not point to existing Alabama law; those cases purported to create new law. Because of this, the opinions in Chavers and Barnes must not be confused with Alabama’s tort law. The legislature never enacted the tort of bad faith, and this Court had no power to do so. Chavers and Barnes thus provide no authoritative evidence of tort law in Alabama. Consequently, the judicially legislated tort of bad-faith refusal to pay an insurance claim should not be recognized as part of Alabama law by this Court or any Alabama court. “For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was bad law, but that it was not law; that is, that it is not the established custom of the realm, as has been erroneously determined.” Commentaries at *70. The tort of bad-faith refusal to pay an insurance claim is not simply bad law; it is not law at all.

IV. Conclusion

In 1998, Justice Maddox urged the Court to look “at the history of the establishment of the tort of bad-faith failure to pay an insurance claim,” stating that “it very well may be appropriate for this Court, or for the Legislature, to reexamine the tort of bad-faith failure to pay.” Gris-sett, 732 So.2d at 982, 984 (Maddox, J., concurring in the result); see also Ex parte Simmons, 791 So.2d 371, 382-83 (Ala.2000) (Maddox, J., concurring in the result) (“The fact that trial courts and this Court are still being presented with questions relating to when, and under what circumstances, a bad-faith cause of action can accrue, suggests that an alternative to the bad-faith cause of action would be more appropriate.”).
Although the legitimacy of the judicially created tort of bad-faith refusal to pay was not challenged in this case, I believe that this Court’s recognition of the tort as the law in Alabama was unconstitutional. I urge the Court to reexamine Chavers, to overrule it in an appropriate case, and to abolish this judicially legislated tort, leaving to the legislative branch the right to determine policy questions such as the intentional breach of an insurance contract by an insurance company.